# Exhibit 2

VOLUME: I
PAGES: 1-198
EXHIBITS: 1

COMMONWEALTH OF MASSACHUSETTS

HAMPDEN, SS. DISTRICT COURT DEPARTMENT OF THE TRIAL COURT

* * * * * * * * * * * * *
COMMONWEALTH *
v. * Docket No. 1820CR000626
REY LESTER AUGUSTINE *
* * * * * * * * * * * * *

TRANSCRIPT OF JURY TRIAL - DAY 1 OF 2
BEFORE THE HONORABLE BETHZAIDA SANABRIA-VEGA

Chicopee, Massachusetts
Courtroom 2
March 27, 2024

Proceedings recorded by Court Personnel
Transcript prepared by Michelle Costantino, CET, ACT

A I believe the initial dispatch was a disturbance.
Q Okay. And did you ultimately arrive at the Hu Ke Lau?
A I did, yes.
Q About what time?
A I'm sorry, I can't. I don't remember.
Q Okay.
A I don't remember the specific time I was there.
Q Okay. Would taking a look at a police report possibly help you?
A Yes, it would.
MR. BREGIANES: Can I approach?
THE COURT: You may.
THE WITNESS: 2155.
BY MR. BREGIANES:
Q Does that refresh your recollection as about what time you got there?
A Yeah. Yes, sir.
Q And what time was that?
A 2155.
Q Which is what in regular time?
A I'm a little rusty. Is that 10 o'clock? No, it's not. 9 o'clock. I don't know. Honestly, I'm a little rusty with the military time since I --
Q I think it's about 10 o'clock, but --
A Okay. Since I retired, I'm a little rusty with the --

Q So anyway, at some time in the night, you arrived there. And what did you do when you arrived there?

A You radio in that you arrived on -- on scene. And then I went inside to see what the issue was, what the situation was.

Q Okay. And based on what you heard in there --

A Mm-hmm.

Q -- what did you do?

A I ended up talking to the manager.

Q Yeah. I don't want to hear -- I'm sorry. Not what each other said to each other, because that's kind of -- it's not admissible. Based on what you learned from various people you talked to, what did you do?

A Well, at the time, and talking to people, the individual -- there was an individual that was involved but he was no longer on scene.

Q Okay.

A And that's when I radioed to the other cars that were allegedly -- I mean, not allegedly, but going to the call, I radioed to them a description of a person that had walked out of the -- out of the building.

Q Okay. And do you recall how you described him?

A White male. I'm not sure if I gave a height or not. Wearing a Red Sox jacket and a baseball cap.

Q And do you see that person in the court today?

A Yes. It would be this young man right here.

advised Officer Brodeur that nobody in the business wanted, excuse me, wanted any kind of a report or anything else like that. So it was just -- just kind of wanted to check to make sure the young man was okay.

Q And that's part of your duties as a police officer?

A Yes. Yep.

Q What do you call that?

A We call it, I call it, and the department calls it, a check the well-being.

Q Okay.

A You know, if there was -- there's a question on whether there was an altercation in Hu Ke Lau where he was thrown to the ground and possibly hit his head, there was an indication of intoxication, so I just wanted to make sure he's okay.

Q What was -- was it a -- this is mid November, about 10 o'clock at night, correct?

A Mm-hmm.

Q Was it warm out?

THE COURT: I'm sorry. Is that a yes?

THE WITNESS: I'm sorry?

THE COURT: Was that a yes?

THE WITNESS: What's that, ma'am?

THE COURT: Your answer. You said mm-hmm. I need to know if it was a yes.

Ask the question again, please.

It was November. The weather.

MR. BREGIANES: I forget what the question was, Judge.

THE COURT: Has to do with the weather.

MR. BREGIANES: Oh, okay.

BY MR. BREGIANES:

Q What was the weather like that evening?

A I would -- November, I believe it was colder.

Q If you don't know -- if you don't know that, sir --

A I don't. I --

Q Okay. Understood. So what is the -- what's the process of a well-being check then?

A Well, you talk to the individual. You see -- you see what his demeanor is. You see what -- how his appearance is. If there's any injuries. And then you -- then you check and see, you know, who he lives with or where he lives. And does he live with somebody who can care for him if he's not, you know -- if he's impaired, can -- is there somebody at the house who can take care of him.

Q Were you part of any conversations with this defendant concerning those issues?

A I sat off to the side. I basically asked him where he was going. And he kept saying that he just wanted to go home. Just wanted -- and I -- and I'm assuming he lived in the park somewhere. We found out afterwards that, yeah, he had a trailer in the -- in the trailer park.

Q Did he give you an address?
A He did. I have no idea what it is, but it's in the park.
Q Okay. Did you have any other conversation with him?
A I asked him if he was okay because I noticed that there was a bump and some blood on his forehead. So I asked him if he was all right.
Q And what did he say?
A He just said, kept saying, I want to go home. I just want to go home. And then I -- because Officer Brodeur and Sergeant Lemay were -- were already dealing with him, I -- I don't like to just keep asking questions and stepping in --
Q Okay.
A -- on what somebody else is doing.
Q Okay. So you step back?
A I step back. Yep.
Q Once you stepped back, could you describe to the jury what you observed?
A He was swaying while he was standing there. As I -- when I stepped back, I stepped back a little bit, enough to -- I couldn't really -- I could hear him talking, but I didn't -- I couldn't hear what he was saying because they were -- they were involved with him.
But he was doing a lot of going back and forth. Every once in a while, he'd have to step, move his leg to step so he wouldn't fall over. And that was -- that was it.

Hamden County.
Q Okay. And you also say you were a K-9 officer?
A Correct.
Q Currently?
A Yes.
Q Back in November of 2017, what was your position with the Chicopee Police Department?
A I was assigned to patrol on the 4 to 12 shift.
Q Patrol officer?
A Correct.
Q And prior to you becoming or during the time you were a patrol officer, did you have any experience or, excuse me, any training in alcohol-related offenses?
A I did.
Q What type of training do you have with respect to that?
A Field sobriety testing, I did both in part-time academy as well as full-time academy.
Q Okay. Did you have any training in identifying intoxication?
A Yes, I did. During both of those academies. And I've also been to a school called ARIDE. I don't know the acronym off the top of my head, but it's essentially advanced recognition of impairment.
Q And could you -- have you done -- in your career, have you done well-being checks?

A I have.
Q Can you tell the jury what that would entail?
A So someone calls, they want the well-being checked on somebody who they think is -- would be impaired or dangerous to themself, intoxicated, drugs, or some sort of mental issue. Could be physical. Just to make sure their well-being is okay.
Q Okay. And if they're not okay, what -- what is it your duty to do?
A It depends on their condition. If they're impaired, to place them in protective custody.
Q Okay. And could you describe what that is?
A So protective custody would be placing them involuntarily in our custody, either at a hospital or the police department, depending on their condition. Essentially to keep an eye on them so they're not a harm to themselves until they're sober enough to care for themselves again.
Q Okay. If there's an injury, though, do you go a different route?
A Correct.
Q And what is that route?
A They'd be going to the hospital.
Q Call an ambulance.
A Correct.
Q Okay. So, on November 16th of 2017, you were brought to

Q Could you point to him, identify an article of clothing he has on it?
A It would be a greenish-blue hoodie.
THE COURT: And the record will reflect identification by the witness.
BY MR. BREGIANES:
Q So what did you do? What did you do when you saw him?
A So I initially observed that individual walking. It would be considered the driveway of 735 Memorial drive, which leads to a trailer park, kind of behind the Hu Ke Lau. Which it's adjacent to the Hu Ke Lau, so it's within close proximity.
So I observed him while operating. I was in a fully marked police car. And I pulled up near him, and I parked, and I exited my car.
Q Were you in a uniform as well?
A I was.
Q Okay. Police uniform?
A Correct.
Q With a badge?
A Yep. Badge and police markings.
Q Okay. And what was your purpose in approaching him?
A I approached him just to check his well-being, see if he would talk to me on what the incident was at the Hu Ke Lau.
Q And why did you want to know that?

A I mean, there's two sides to every story. So there's obviously officers in the Hu Ke Lau talking to them. And we obviously want to get a story from the other half of whatever incident occurred.
Q Okay. So you get out of your car?
A Correct.
Q And what did you do next?
A I approached him. I asked him if he would talk to me, which he -- he did stop and agreed to speak with me.
Q Okay. And at that point, did you make any observations about him?
A I did. While he was walking, he was swaying back and forth, uneasy on his feet. While speaking to him, he was slurring his words, talking slow. You could tell his eyes were glazed over, half closed and bloodshot.
Q Did you notice anything else?
A He had a -- a large lump on his forehead of blood running down his face.
Q So you say you attempted -- you had a conversation, at least started a conversation with him?
A Correct.
Q Can you tell us what was said?
A I don't remember --
A At the beginning, initially?
A Initially, I just asked them what happened at Hu Ke Lau.

He didn't really provide information. I tried to ask him where he lived. He wouldn't tell me where he lived other than just right here. But obviously it's a trailer park with multiple units, so it's hard to pinpoint what right here means.

Q He just said right here?

A Correct.

Q How many trailer homes are in the park?

A I don't know offhand, but probably more than 50 if I was to guess.

Q And are there multiple streets in this complex or is it just one road?

A There's multiple streets within the trailer park and multiple trailer homes on those streets.

Q And about what time of day was this?

A I believe around 9 o'clock, p.m.

Q Okay. So what happened next?

A At that point, around that time, Officer Dumais arrived. Due to what I believe to be a highly-intoxicated state -- while he was speaking, I could smell alcoholic beverages on his breath as well -- and due to the severe injury on his head, it was decided best to place him in protective custody at that point, or at least get him to the hospital in one way or another.

Q So your attention was medical attention, not going to the

police station. Is that it?
A Correct. Due to his injury, he would have to be seen by medical staff.
Q And what level of intoxication did you form the belief that he was in?
A I believed he was very intoxicated.
Q And could you just tell us a couple reasons why?
A Just based on how agitated he was when speaking to him, the odor of alcoholic beverages on his breath, him not being able to keep his balance, it was hard to talk to him. Just -- and, I mean, him coming from the Hu Ke Lau, which has alcohol, sells alcohol. Just based on the totality of the circumstances, I believed he was highly intoxicated.
Q And what was your concern if you let him go home?
A I mean, my concern was that he would start walking home, maybe pass out somewhere. And we don't know how -- the extent of his head injury, just his personal welfare at that point.
Q So what did you do next?
A At that point, I advised him that he was going to be placed in protective custody, at which point he became more agitated, began yelling, screaming, profanities, and just escalating.
Q Okay. Had you physically touched him at this point?
A Not at that point, no.
Q And what kind of things was he yelling?

A Profanities. I don't remember specifically at this point, but just being belligerent in general.
Q So what did you do? As he was being agitated or yelling, what did you do next?
A So at that point, he started kind of walking backwards, trying to create distance between us. He was obviously agitated because he didn't want to be placed in protective custody.
So, at that point, I approached him on his left side, Officer Dumais had approached his right side, in an attempt to control him.
Q Okay. And so you're on his left side?
A Correct.
Q Okay. And what happens next?
A So I attempted to grab his left wrist, Officer Dumais attempted to grab his right wrist, to place him in handcuffs to be able to control him due to his belligerent state.
He wound up his right arm in an attempt to punch me in the face, at which point was stopped by Officer Dumais. At that point, I conducted an arm-bar takedown technique to bring him to the ground to be able to control him better.
Q Okay. And can you -- so he's about to throw -- he's trying to throw a punch and it was stopped by the other officer?
A Correct.

Q Okay. And at that point, you decided that you had to take him to the ground. Is that right?
A That's correct.
Q Okay. And how did you -- I know you said arm-bar control, but could -- in layman's terms, could you tell us what that -- what that is?
A Yep. So an arm-bar would be I would have my left hand on his wrist, and you rotate his wrist forward so that kind of forces the upper body to bend over a little bit. You put your other hand on the back of that same arm and you kind of guide them to the ground. So it's controlled. So you always have their arms. So you're not just slamming them in the ground. It's you're guiding them down to control them.
Q And were you able to do that?
A I was able to bring him to the ground, yes.
Q Okay. Did that cause any injury to him?
A It did not.
Q Okay. Once you got -- once you had him controlled on the ground, what happened next?
A At that point, we attempted to pull his hands together to successfully handcuff him. He began kicking us with his feet and thrashing around on the ground, continued pulling his arms away from us.
Q Okay. Did he kick you?
A He did.

Q On what part of your body?
A I think my legs. So I was kneeled down at that point.
Q Okay. And did you see him kicking Officer Dumais?
A I did.
Q And where was he kicking that officer?
A Same area.
Q So what happened next?
A We were able to eventually successfully handcuff him. Myself and Officer Dumais were able to help him to his feet and walk him towards the police car.
Q Okay. At this point in time, are you having any conversation with him?
A Not that I recall. He was -- while walking him to the cruiser, he kept trying to break away from our grasp, thrashing around, just yelling and being belligerent still.
Q What kind of stuff was he yelling?
A Profanities, and I don't remember specifically.
Q At this point, did you consider him under arrest?
A It was still an evolving situation. Either way, he's definitely going to the hospital, whether he was under arrest or not. But our first priority was controlling him and making sure the scene was safe at that point.
Q Okay. So he's back on his feet, am I right? You eventually --
A Correct. Yeah.

Q -- had him back on his feet?
A Yes.
Q And you said -- at that point, was he still thrashing?
A He was, yes.
Q What do you mean by thrashing?
A Just twisting his body around, trying to break our grasp as we were holding onto him, trying to control his body and his movements from any further assaults on us.
Q And what was the next thing that you recall happening?
A At that point, we brought him up to the marked police car in an attempt to search him prior to being transported.
Q So you need to search -- search him before you put him in the police car?
A Correct. Or if he's being transported to the police department, like, we have to make sure he doesn't have any weapons.
Q Okay. How about if -- how about if there's an ambulance coming?
A Yes.
Q You have to search him?
A Yes, I would search him.
Q That's the procedure?
A Correct.
Q And what's the reason for that?
A To make sure they don't have any weapons on them.

Especially being as aggressive as he was, if he had weapons, he could cause harm to the ambulance staff and the hospital as well.

Q And the next thing you recall happening?

A So I began -- I was on his left. Officer Dumais was on his right. I began searching the left side of him, at which point he kicked Officer Dumais on his right, turned and spit in my face, in my mouth, and then he kicked or attempted to kick Officer Dumais again, at which point he fell down to the ground.

Q So this happened while you were attempting to search his left side?

A That's correct.

Q Was Officer Dumais part of the search as well or was he doing something else?

A Yeah. He would have been searching his right side.

Q And can you -- can you be a little bit more specific about the kick and the spit, if you can recall?

A Yeah. So I was conducting a search on his left side. He did a quick kick to Officer Dumais's leg area. Quickly turned, spit in my face, which also got in my mouth. At which point I turned and attempted to spit his spit out of my mouth. Which at the same time, I could even taste alcoholic beverages on his spit that was in my mouth. Which is kind of disgusting, but -- and then he quickly attempted to or -- kick

Officer Dumais in the legs again. And then fell down, lost his balance.
Q Okay. As he -- okay. And did you see him falling?
A I did not.
Q Did you do anything to try to prevent the fall?
A Yeah. So when I was -- when I was turning, trying to spit his spit out of my mouth, I was trying to control his head or his upper body or something. Which ultimately I wasn't able to because of him moving around so much, kicking Officer Dumais and all that.
Q Okay. So you didn't see him fall. Is that what you're saying?
A I did not.
Q Okay. And did you do anything in an attempt to stop him from falling?
A Just besides attempting to control his body, which I wasn't able to before, prior to him falling, Officer Dumais grabbed his jacket in attempt to break his fall. Which was unzipped, so it rode up his arms, so he ultimately collided with the ground.
Q Okay. So now, what happened after he hit the ground?
A After he hit the ground, he became somewhat unconscious. And then we helped him off the ground and sat him up against the police car.
Q And did you notice -- make any notes or notice anything

back?
A Yes. I was searching him at the time though.
Q Okay. But then your testimony is he simply fell to the ground, right?
A I wouldn't say he just simply fell to the ground.
Q Is that what you wrote in your report?
A He kicked at Officer Dumais and lost his balance and fell.
Q He fell to the ground?
A Correct.
Q And he fell on his head?
A Correct.
Q In the exact same spot where he had the same mark on his head from before?
A Correct.
Q Are you sure he didn't hit his head against the car?
A Yeah. Yes.
Q You're sure?
A Yep.
Q Trying to get him into the car?
A He was never placed in the car.
Q You didn't try to get him into the car?
A The door was closed.
Q Didn't hit him on the door frame of the car?
A No.

A Four or five minutes.
Q Okay.
A I don't know if he was picking up -- if he went somewhere else to talk to another officer, went up the street to do something else, I just know he left to pick up items.
Q Well, let me ask you this. You said that Officer McQuaid was there during some of the conversations.
MR. GOODHINES: Excuse me one second.
THE COURT: Allergies?
MR. GOODHINES: Yes. Excuse me, Judge.
BY MR. GOODHINES:
Q At some point, you said that he was participating in the conversation?
A He was -- he was there for the conversation, yes.
Q But was the conversation during or before or after a bag of items was thrown?
A He threw the items right before he tried to deliver the punch there, sir.
Q Okay. So was McQuaid in a conversation with him when he drew a bag of items?
A I don't believe he was speaking with him, but he was -- he was present.
Q Okay. And were you in the conversation when the bag of items was thrown?
A I was -- I was there. Again, I don't believe I was still

speaking with him. I was -- I was in front of him, but yes.
Q Had you started speaking with him?
A I asked him for his Social Security number prior.
Q So you had already joined the conversation?
A Yes.
Q And then he threw the bag of items?
A Yes.
Q Randomly?
A Yes.
Q Was there a word or a sentence or statement made to him that made him throw the bag of items?
A I don't recall.
Q So, to the best of your knowledge, there was no triggering event that made him throw a bag of items to the ground?
A No.
Q And then Officer McQuaid -- excuse me, I don't want to get the name -- the officer's name again?
A Officer McQuaid.
Q McQuaid then just abandoned the conversation and doesn't rejoin the conversation until after all of the items were picked up?
A He came after all of the items were picked up. Yes, sir.
Q Okay. And when he came back, did he come back after Mr. Augustine was unconscious and on the ground?

or with anyone?

No. Okay. Thank you. For the record, they've all shaken their heads no or said no.

So Commonwealth has rested. Now, the defense.

Attorney Goodhines, you have any witnesses?

MR. GOODHINES: Your Honor, at this time, the defendant would take the stand.

THE COURT: Okay. Mr. Augustine. You can bring your bottle of water with you if you'd like.

THE DEFENDANT: Okay. Thank you.

THE COURT: You're welcome.

THE CLERK: Raise your right hand.

REY AUGUSTINE, SWORN

THE WITNESS: I do.

THE CLERK: Thank you. There are some steps right there.

THE COURT: Your witness. And I don't know if you want to be at your mic because it will pick you up better.

I mean, I know you're used to being over there, and for cross-examination that's phenomenal. But for direct, you might want to be closer.

MR. GOODHINES: No problem. Thank you, Judge.

THE COURT: Mm-hmm.

MR. GOODHINES: May I proceed?

THE COURT: You may.

MR. GOODHINES: Thank you.

handcuffs were put on you, or both?
A I think both. But you know, again, I'm not 100 percent sure if it was before handcuffs or after.
Q Okay. Could you describe what happened with you and the officers when you were taken to the cruiser?
A I remember my head being slammed against the door of the cruiser.
Q Okay.
A Definitely a part of the cruiser. I think it was the door.
Q Okay. And what was the next thing you remember after that happened?
A I woke up in hospital at some point. You know, it's -- it's difficult to remember, you know, exactly.
Q I'm sure it is.
A I remember waking up in the hospital.
Q Do you ever remember being in an ambulance?
A Not exactly.
Q Okay. Who do you remember seeing at the hospital?
A My parents.
MR. GOODHINES: Okay. Your Honor, may I approach?
THE COURT: You may.
BY MR. GOODHINES:
Q Mr. Augustine, I show you this photograph and asked you if you recognize it?

VOLUME: II
PAGES: 1-55
EXHIBITS: None

COMMONWEALTH OF MASSACHUSETTS

HAMPDEN, SS. DISTRICT COURT DEPARTMENT OF THE TRIAL COURT

* * * * * * * * * * * * *

COMMONWEALTH *

v. * Docket No. 1820CR000626

REY LESTER AUGUSTINE *

* * * * * * * * * * * * *

TRANSCRIPT OF JURY TRIAL - DAY 2 OF 2
BEFORE THE HONORABLE BETHZAIDA SANABRIA-VEGA

Chicopee, Massachusetts
Courtroom 2
March 28, 2024

Proceedings recorded by Court Personnel
Transcript prepared by Michelle Costantino, CET, ACT

THE CLERK: And, Court Officer Silveira (phonetic), could you please get the envelope from Mr. Foreperson.

THE COURT: Thank you.

THE CLERK: So, Mr. Foreperson, you've reached a verdict. What say you, Mr. Foreperson, is the defendant guilty or not guilty to the alleged complaint of assault and battery on a police officer?

First officer -- I'll do numerically -- Timothy Brodeur?

THE FOREPERSON: Guilty.

THE CLERK: And what say you, Mr. Foreperson, as to -- is the defendant guilty or not guilty to the alleged complaint of assault and battery on a police officer, this police officer, Mickey Dumais?

THE FOREPERSON: Guilty.

THE CLERK: Mr. Foreperson and members of the jury, harken to your verdict as recorded by the Court.

The jurors upon their oath so say that the defendant is guilty as charged in said complaint.

So say you, Mr. Foreperson? So say you, members of the jury?

THE FOREPERSON: Guilty.

THE CLERK: I need everybody to answer.

THE COURT: So is it yes?

THE JURY: Yes.

THE COURT: Okay.

THE CLERK: Thank you.

THE COURT: All right. So you can go right into the jury deliberation room. I will be in there momentarily.

THE COURT OFFICER: All rise. Jury exiting.

(Jury excused)

THE COURT: Okay. So Commonwealth, you move for sentencing?

MR. BREGIANES: Commonwealth moves for sentencing, Judge.

THE COURT: I'll hear you.

MR. BREGIANES: Judge, we'd ask that this defendant be sentenced to 18 months in the House of Correction.

That sentence is based on numerous convictions for resisting arrest and assault and battery on a police officer. Some of them the consequence was committed jail time.

I do note a 2015 conviction where I believe it was an 18-month sentence, 6 months he was sentenced direct, and the balance was left I believe for a year.

But there have been so many of them, Judge. There's at least five or six or seven charges of assault and battery on a police officer. When he gets intoxicated, he's a danger.

So I don't think promotion -- probation is warranted at this point, and so we are asking for the 18 months.

THE COURT: Attorney Goodhines?

MR. GOODHINES: Your Honor, I would suggest that the Commonwealth's recommendation is totally inappropriate.